# UNITED STATES *v.* BITTY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 503.   Submitted January 27, 1908.—Decided February 24, 1908.

It is within the power of Congress to determine the regulations and exceptions under which this court shall exercise appellate jurisdiction in cases other than those in which this court has original jurisdiction and to which the judicial power of the United States extends; and the act of March 2, 1907, c. 2564, 34 Stat. 1246, permitting the United States to prosecute a writ of error directly from this court to the District or Circuit Courts in criminal cases in which an indictment may be quashed or demurrer thereto sustained where the decision is based on the invalidity or construction of the statute on which the indictment is based, is not unconstitutional because it authorizes the United States to bring the case directly to this court and does not allow the accused so to do when a demurrer to the indictment is overruled.

In construing an act of Congress prohibiting the importation of alien women for prostitution or other immoral purposes regard must be had to the views commonly entertained among the people of the United States as to what is moral and immoral in the relations between man and woman and concubinage is generally regarded in this country as immoral.

While penal laws are to be strictly construed they are not to be construed so strictly as to defeat the obvious intent of the legislature. .

While under the rule of *ejusdem generis* the words "or other immoral purpose" would only include a purpose of the same nature as the principal subject to which they were added they do include purposes of the same nature, such as concubinage, when the principal subject is prostitution and the importation of women therefor.

The prohibition in the alien immigration act of February 20, 1907, c. 1134, 34 Stat. 898, against the importation of alien women and girls for the purpose of prostitution or any other immoral purpose includes the importation of an alien woman or girl to live as a concubine with the person importing her.

THE facts, which involve the construction of the acts of Congress regulating the immigration of aliens into the United States, are stated in the opinion.

*The Attorney General* and *Mr. Assistant Attorney General Cooley* for plaintiff in error:

The rule of *ejusdem generis* does not apply to this case. The rule is merely a technical rule of construction which the courts have frequently declined to apply, when by so doing the manifest intention of the legislature would have been defeated. *Wilkinson* v. *Leland*, 2 Peters, 662; *State* v. *Williams*, 2 Strob. L. R. 474; *Regina* v. *Payne*, L. R. 1; C. C. 27. See also *Willis* v. *Mabon*, 48 Minnesota, 140, 155; *Webber* v. *City of Chicago*, 148 Illinois, 314; *Gillock* v. *The People*, 171 Illinois, 307; *Woodworth* v. *State*, 26 Ohio St. 196; *Winters* v. *Duluth*, 82 Minnesota, 127; *City of St. Joseph* v. *Elliott*, 47 Mo. App. 418; *Foster* v. *Blount*, 18 Alabama, 687; *Haigh* v. *The Town Council of Sheffield*, L. R. 10; Q. B. 102; *Bows* v. *Fenwick*, L. R. 9; C. P. 339.

The immigration act of 1907 should be considered as a whole and in connection with other statutes *in pari materia* in determining its meaning. When §§ 2 and 3 of the act are read together they show the clearly expressed purpose of the Congress to prevent the immigration of numerous classes of persons regarded as undesirable additions to the population of the country. Among those excluded are idiots, epileptics, paupers, professional beggars, persons afflicted with tuberculosis or any loathsome or dangerous contagious disease, persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude, polygamists, anarchists, and contract laborers, as well as prostitutes and women or girls brought in for purposes of prostitution or for any other immoral purpose.

The Congress has deliberately made the exclusion of persons more comprehensive in the act of 1907 than in the acts of 1891 (26 Stat. 1084), 1893 (27 Stat. 569), and 1903 (32 Stat. 1213). The narrow construction placed upon the act by Judge Hough

defeats the intention of the legislature, which clearly was to exclude various undesirable classes of persons, among others women of loose moral character.

Even should the rule *ejusdem generis* be applied herein, the finding of the court below is not warranted by the language of the statute. The words "for any other immoral purpose" must be given some meaning, and that given to them by the trial court limits them to an extent evidently not contemplated by Congress. The courts have repeatedly refused, even when applying the rule of *ejusdem generis*, to apply it in a narrow sense. *Misch* v. *Russell*, 136 Illinois, 22; *Queen* v. *Edmundson*, 2 Ellis & Ellis, 77; *County of Union* v. *Ussery*, 147 Illinois, 204.

It can hardly be denied that the act of the defendant in error in importing the woman mentioned in the indictment is one which is generally condemned by the moral sense of all enlightened communities and is assuredly contrary to purity. But it is more than that. Both the common and statute law have uniformly recognized illicit sexual relations as immoral, and courts have repeatedly refused to enforce contracts the consideration for which was future illicit cohabitation. Such purpose is one which the law seeks to defeat and holds as against sound public policy and deserving of condemnation by right-thinking men.

The conduct of the defendant in error was "immoral" as matter of strict law and this position is amply sustained by state and Federal authorities. *Ralston* v. *Boady*, 20 Georgia, 449, and cases cited; *Potter* v. *Gracie*, 58 Alabama, 303; *Walker* v. *Perkins*, 3 Burrows, 1568; *S. C.*, 1 W. Black, 517; *Nye* v. *Moseley*, 6 Barnewall & Cresswell, 133. See also *Walker* v. *Gregory*, 36 Alabama, 180; *Winebrinner* v. *Weisiger*, 19 Kentucky, 33; *Reed* v. *Brewer*, 36 S. W. Rep. 99; *Mackbee* v. *Griffith*, 2 Cranch C. C. 336.

*Mr. Edward A. Alexander* for defendant in error:

Counsel for defendant conceded in the court below, and concedes here, that concubinage is highly immoral, and that

it has been recognized as such by various States, which have passed laws against it. However, whether it be immoral or not is not the question. The only question involved on this point is whether or not Congress intended to legislate against those isolated cases where certain individuals come into this country with their mistresses.

The statute in question is a criminal statute and must be strictly construed.

The term "prostitute" necessarily implies the idea of a female who hires the use of her body for money, whereas the term "mistress" implies the case of one who cohabits with a male without being married to him.

There is a marked degree of difference between a prostitute and a mistress. If Congress had intended to cover the case of mistresses, who are not prostitutes, and who are in no way connected with the importation of prostitutes, or with the "white slave trade," Congress could and would readily have said so by the use of apt language, as it cannot be presumed that Congress, which is one of the most intelligent bodies of government in the world, does not know how to use the English language to adequately designate its intentions.

The act of Congress under which this appeal was prosecuted by the United States is of doubtful validity.

The act gives the Government of the United States the right to appeal from a judgment or decree sustaining a demurrer to an indictment where the constitutionality or construction of a statute is involved. The act does not give to the defendant the right to appeal from a judgment or decree overruling his demurrer.

Furthermore, the act gives the Government the right to appeal in a criminal case where the construction of the statute is involved, and not in a criminal case where the defendant is indicted for violating a statute, but in which the construction of the statute does not come into question.

Furthermore, had the defendant in this case pleaded not guilty and gone to trial, had a jury been sworn, and a motion

made for the direction of a verdict of acquittal, and granted, it is believed, under the jeopardy clause of the Constitution, the defendant could not again be tried, and no appeal would lie, but because he demurred an appeal does lie.

The difference between the state legislatures and Congress is that the state legislatures possess all of the powers of the people of the State, except those which are expressly prohibited, whereas Congress only possesses those powers expressly granted or necessarily implied to carry out the objects for which Congress was created or for which the powers conferred were given.

It is conceded that Congress has the power to increase or diminish the appellate power of the Supreme Court, but it is doubted whether the people of the United States have given to Congress the power to pass partial legislation, which affects differently persons in the same class covered by the legislation:

Section 2, Article IV, of the Constitution provides that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States."

An act providing for appeals in certain specific cases, and also giving the Government the right to appeal and not giving the same right to the defendant, seems not only to be partial legislation, but seems to be also in conflict with Art. IV, § 2, of the Constitution, providing that "the citizens of each State shall be entitled to all privileges and immunities of the citizens in the several States."

MR. JUSTICE HARLAN delivered the opinion of the court.

This is a criminal prosecution under an act of Congress regulating the immigration of aliens into the United States.

By the act of March 3, 1875, c. 141, relating to immigration, it was made a felony, punishable by imprisonment not exceeding five years and by fine not exceeding five thousand dollars, for any one knowingly and willfully to import or to cause the importation of women into the United States for the purposes of "prostitution." 18 Stat. 477.

By the act of March 3, 1903, § 3, c. 1012, it was provided: "That the importation into the United States of any woman or girl for the purposes of prostitution is hereby forbidden; and whoever shall import or attempt to import any woman or girl into the United States for the purposes of prostitution, or shall hold or attempt to hold, any woman or girl for such purposes in pursuance of such illegal importation shall be deemed guilty of a felony, and, on conviction thereof, shall be imprisoned not less than one nor more than five years and pay a fine not exceeding five thousand dollars." 32 Stat. 1213, 1214, Pt. 1.

A more comprehensive statute regulating the immigration of aliens into the United States was passed on February 20, 1907, c. 1134. By that act the prior act of 1903 (except one section) was repealed. The third section of this last statute was in these words: "That the importation into the United States of any alien woman or girl for the purpose of prostitution, *or for any other immoral purpose,* is hereby forbidden; and whoever shall, directly or indirectly, import, or attempt to import, into the United States, any alien woman or girl for the purpose of prostitution, or for any other immoral purpose, or whoever shall hold or attempt to hold any alien woman or girl for any such purpose in pursuance of such illegal importation, or whoever shall keep, maintain, control, support, or harbor in any house or other place, for the purpose of prostitution, or for any other immoral purpose, any alien woman or girl, within three years after she shall have entered the United States, shall, in every such case, be deemed guilty of a felony, and on conviction thereof be imprisoned not more than five years and pay a fine of not more than five thousand dollars; and any alien woman or girl who shall be found an inmate of a house of prostitution or practicing prostitution, at any time within three years after she shall have entered the United States, shall be deemed to be unlawfully within the United States and shall be deported as provided by sections twenty and twenty-one of this Act." 34 Stat. 898, Pt. 1.

The defendant in error Bitty was charged by indictment in

the Circuit Court of the United States for the Southern District of New York with the offense of having unlawfully, willfully, and feloniously imported into the United States from England a certain named alien woman for "an immoral purpose," namely, "that she should live with him as his concubine."

The Circuit Court having sustained a demurrer to the indictment and dismissed the case the United States prosecuted this writ of error under the authority of the act of March 2, 1907, 34 Stat. 1246, c. 2564. That statute authorizes a writ of error, on behalf of the United States, from the District or Circuit Courts directly to this court in all criminal cases in which an indictment is quashed or set aside or in which a demurrer to the indictment or any count thereof is sustained, "where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment is founded."

The demurrer to the indictment was sustained and the indictment dismissed upon the ground that the statute, properly construed, did not make it an offense for one to bring and import an alien woman into the United States for the purpose of having her live with him as his concubine. The case is, therefore, one in which the United States was entitled, under the above act of 1907, to prosecute a writ of error from this court unless, as the accused suggests, the act is unconstitutional in that it authorizes the United States in the cases specified to bring the case directly to this court, but does not allow the accused to bring it here when a demurrer to the indictment or to some count thereof is overruled. There is no merit in this suggestion. Except in cases affecting ambassadors and other public ministers and consuls and those in which a State shall be a party—in which cases this court may exercise original jurisdiction—we can exercise appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as Congress shall make in the other cases to which by the Constitution the judicial power of the United States extends. Const. Art. III, § 2. What such exceptions and regula-

tions should be it is for Congress, in its wisdom, to establish, having of course due regard to all the provisions of the Constitution. If a court of original jurisdiction errs in quashing, setting aside or dismissing an indictment for an alleged offense against the United States, upon the ground that the statute on which it is based is unconstitutional, or upon the ground that the statute does not embrace the case made by the indictment, there is no mode in which the error can be corrected and the provisions of the statute enforced, except the case be brought here by the United States for review. Hence—that there might be no unnecessary delay in the administration of the criminal law, and that the courts of original jurisdiction may be instructed as to the validity and meaning of the particular criminal statute sought to be enforced—the above act of 1907 was passed. Surely such an exception or regulation is in the discretion of Congress to prescribe, and does not violate any constitutional right of the accused. *Taylor* v. *United States*, 207 U. S. 120. Congress was not required by the Constitution to grant to an accused the privilege of bringing here upon the overruling of a demurrer to the indictment and before the final determination of the case against him, the question of the sufficiency of the indictment simply because, in the interest of the prompt administration of the criminal law, it allowed the United States to prosecute a writ of error directly to this court for the review of a final judgment which stopped the prosecution by quashing or dismissing the indictment upon the ground of the unconstitutionality or construction of the statute.

We come now to the merits of the case, and they are within a very narrow compass. The earlier statutes, we have seen, were directed against the importation into this country of alien women for the purposes of prostitution. But the last statute, on which the indictment rests, is, we have seen, directed against the importation of an alien woman "for the purpose of prostitution *or* for any other immoral purpose;" and the indictment distinctly charges that the defendant imported the alien woman in question "that she should live with him as his concubine,"

that is, in illicit intercourse, not under the sanction of a valid or legal marriage. Was that an immoral purpose within the meaning of the statute? The Circuit Court held, in effect, that it was not, the bringing of an alien woman into the United States that she may live with the person importing her as his concubine not being in its opinion an act *ejusdem generis* with the bringing of such a woman to this country for the purposes of "prostitution." Was that a sound construction of the statute?.

All will admit that full effect must be given to the intention of Congress as gathered from the words of the statute. There can be no doubt as to what class was aimed at by the clause forbidding the importation of alien women for purposes of "prostitution." It refers to women who for hire or without hire offer their bodies to indiscriminate intercourse with men. The lives and example of such persons are in hostility to "the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guaranty of that reverent morality which is the source of all beneficent progress in social and political improvement." *Murphy* v. *Ramsey*, 114 U. S. 15, 45. Congress no doubt proceeded on the ground that contact with society on the part of alien women leading such lives,would be hurtful to the cause of sound private and public morality and to the general well-being of the people. Therefore the importation of alien women for purposes of prostitution was forbidden and made a crime against the United States. Now the addition in the last statute of the words, "or for any other immoral purpose," after the word "prostitution," must have been made for some practical object. Those added words show beyond question that Congress had in view the protection of society against another class of alien women other than those who might be brought here merely for purposes of "prostitution." In forbidding the importation of alien women "for any other immoral purpose," Congress evidently thought

that there were purposes in connection with the importations of alien women which, as in the case of importations for prostitution, were to be deemed immoral. It may be admitted that in accordance with the familiar rule of *ejusdem generis*, the immoral purpose referred to by the words "any other immoral purpose," must be one of the same general class or kind as the particular purpose of "prostitution" specified in the same clause of the statute. 2 Lewis' Sunderland Stat. Const., § 423, and authorities cited. But that rule cannot avail the accused in this case; for, the immoral purpose charged in the indictment is of the same general class or kind as the one that controls in the importation of an alien woman for the purpose strictly of prostitution. The prostitute may, in the popular sense, be more degraded in character than the concubine, but the latter none the less must be held to lead an immoral life, if any regard whatever be had to the views that are almost universally held in this country as to the relations which may rightfully, from the standpoint of morality, exist between man and woman in the matter of sexual intercourse. We must assume that in using the words "or for any other immoral purposes," Congress had reference to the views commonly entertained among the people of the United States as to what is moral or immoral in the relations between man and woman in the matter of such intercourse. Those views may not be overlooked in determining questions involving the morality or immorality of sexual intercourse between particular persons. Chief Justice Marshall, speaking for the court, said that "though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. The intention of the legislature is to be collected from the words they employ. . . . The case must be a strong one indeed, which would justify a court in departing from the plain

meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest." *United States* v. *Wiltberger*, 5 Wheat. 76, 95, 96. In *United States* v. *Winn*, 3 Sumner, 209, 211, Mr. Justice Story said that the proper course is "to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature." To the same effect are *United States* v. *Morris*, 14 Pet. 464; *American Fur Co.* v. *United States*, 2 Pet. 358, 367; *United States* v. *Lacher*, 134 U. S. 624, 628; Sedgwick on Stat. Constr. (2d ed.) 282; Maxwell on Interpretation of Statutes, (2d ed. 318). Guided by these considerations and rules, we must hold that Congress intended by the words "or for any other immoral purpose," to include the case of anyone who imported into the United States an alien woman that she might live with him as his concubine. The statute in question, it must be remembered, was intended to keep out of this country immigrants whose permanent residence here would not be desirable or for the common good, and we cannot suppose either that Congress intended to exempt from the operation of the statute the importation of an alien woman brought here only that she might live in a state of concubinage with the man importing her, or that it did not regard such an importation as being for an immoral purpose.

The judgment must be reversed, and the case remanded with directions to set aside the order dismissing the indictment and overrule the demurrer, and for such further proceedings as will be consistent with this opinion.

*It is so ordered.*