# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 10, 2009

Charles R. Fulbruge III
Clerk

No. 08-10461

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES CORNELL CLARK, Reverend;
MOUNT VERNON FAITH-IN-ACTION OUTREACH PROJECT;
MOUNT VERNON UNITED METHODIST COMMUNITY DEVELOPMENT;
TRINITY CHRISTIAN OUTREACH MINISTRIES;
MOUNT VERNON UNITED METHODIST CHURCH COMMUNITY
OUTREACH CORPORATION;
CLARK EVANGELISTIC OUTREACH MINISTRIES, INC.,

Defendants-Appellants.

* * * * * * * * * * * * * * * * * * * *

No. 08-10467

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

REVEREND JAMES CORNELL CLARK,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Texas
No. 5:07-CR-16-1

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

James Clark appeals his conviction, asserting a novel due process challenge to a federal statute. We affirm.

I.

Clark, a minister of a church in Lubbock, Texas, met Carolyne Njau in August 2005 while on a trip to Kenya. Clark approached Njau, a prostitute at the time, in a hotel coffee shop. He falsely claimed to be a Texas Tech University professor and a minister and, after chatting with Njau, invited her to his room to talk further. Njau and Clark discussed her education,[1] and Clark volunteered that his church might be able to provide her a scholarship for study in the United States.

Once inside his hotel room, Clark encouraged Njau to shower in his bathroom and, as she was showering, pulled back the curtain and complimented her body. After her shower, Njau left the bathroom to find Clark in his underwear. She testified that he touched her sexually as they watched a movie, and he had her pose while he took a picture of her genitals.[2] As Njau left his hotel room, Clark gave her $100, instructing her to have herself tested for sexually trans-

---

[1] Njau carried her school transcript with her at all times, hoping she would meet someone to help her find work or education.

[2] That picture was recovered from Clark's computer and introduced at his trial.

mitted diseases. She complied and reported back with the negative results.

In November 2005, after he left Kenya, Clark told Njau that his church would sponsor her education in the United States.[3] In the following months, they communicated frequently in preparation for her trip to the United States and her enrollment at a college in Levelland, Texas, near Lubbock. When Njau informed Clark that she would be unable to afford her airfare, he agreed to pay it but suggested that she could pay him back by "serv[ing]" his friends. Njau took that to imply sexual services in return for money, and she feared that Clark would lead her back to prostitution; she accepted the airline ticket anyway.

From Njau's first day in the United States in January 2006, Clark controlled her every move. He spoke to her abusively when he picked her up at the airport and instructed her to stay on campus each week from Monday to Friday, when he would take her to his house for the weekend. He warned that "in this country, if you do somebody wrong, they will just shoot you," that "white people don't like black people," and that Njau "should not . . . indulge into things [sic] that will get [her] in trouble." Njau felt frightened and intimidated and worried that Clark could kill her.

Clark's sexual advances continued. He forced her into his bed that first night and sexually assaulted her in various ways. She told him to stop and that he was hurting her, but he did not listen. Before taking her to the college campus for the first time, he had her tested for sexually transmitted diseases once again, accompanying her to the clinic and representing himself on clinic forms as her uncle.[4]

Even after Njau moved into her dormitory, Clark communicated with her every day by phone or e-mail, frequently demanded sex, and often came to cam-

---

[3] Clark's church was not in fact involved with his criminal activities. Rather, Clark used money from shell entities he had set up to defraud the federal government.

[4] On another occasion, Clark introduced Njau as his daughter.

pus to look for her. He required her to keep him informed of where she was and what she did. A college dean encountered him once at Njau's dormitory and noticed that Clark knew surprisingly a lot about Njau's whereabouts and activities.

When Njau refused sex, Clark threatened, in e-mails and phone conversations, to have her deported. He began calling the scholarship he had arranged a "loan" of his own money and made it evident that he expected sex as repayment.[5] He said that he expected her to continue prostitution in the United States, evidently with himself as her sole client. Despite Njau's continued refusals, his threats of deportation eventually led to another sexual encounter.

Njau finally confided in a school administrator, who contacted authorities. The district attorney asked Njau to record a phone conversation with Clark, which she did on April 3, 2006. In the recording, Clark said in explicit terms that he would allow Njau to stay in the country only if she provided him and his friends with sexual favors. The next day, Clark was arrested on the state charge of compelling prostitution.

Clark was convicted of importation of an alien for prostitution or other immoral purposes under 8 U.S.C. § 1328.[6] He was also convicted of several counts of fraud and money laundering. On appeal, he challenges only his § 1328 conviction, but because of the effect of that conviction on his sentencing guideline range, he requests that this court vacate his entire sentence. Clark attacks § 1328 as both overbroad and vague.

---

[5] Clark had Njau and other Kenyan students clean his house. He paid the other students but not Njau.

[6] Section 1328 reads, in relevant part, "The importation into the United States of any alien for the purpose of prostitution, or for any other immoral purpose, is forbidden." It is the international counterpart of the Mann Act, 18 U.S.C. § 2421, which when originally enacted applied the same prohibition to movement across state lines.

II.

Clark argues that § 1328 is facially invalid, at least as it relates to "immoral purposes." Although he does not challenge the statute's prohibition of importing aliens for purposes of prostitution, he observes that the general verdict could have been on either basis. "We review questions of law *de novo*. Because a facial challenge to the constitutionality of a statute presents a pure question of law, we employ that standard here as we examine the merits." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) (citation omitted). As we recognized in *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 548 (5th Cir. 2008), "in *Village of Hoffman Estates [v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982) ("*Hoffman*"),] the Supreme Court announced the proper procedure for analyzing a facial vagueness challenge." The first step is the overbreadth analysis, in which the court must

> to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.

*Hoffman* 455 U.S. at 494-95 (footnote omitted).

A.

So we begin with the overbreadth challenge. It requires little discussion, because the overbreadth doctrine is applicable only to First Amendment challenges,[7] and § 1328 does not even arguably implicate First Amendment rights.

---

[7] *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."); *United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("[C]hallenges to statutes which do not involve *First Amendment* freedoms must be examined in light (continued...)

Even if, *arguendo*, the decision in *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (plurality), were read to expand the overbreadth doctrine to protected liberty interests,[8] § 1328, as we will show *infra*, does not infringe on any constitutional rights.

## B.

We move therefore to Clark's vagueness challenge. As we have said, to be unconstitutionally vague, a statute must be "impermissibly vague in all its applications," *Hoffman*, 455 U.S. at 495, including its application to the party bringing the vagueness challenge, *Roark & Hardee*, 522 F.3d at 546-47, 551 n.19. "Objections to vagueness under the Due Process Clause rest on the lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). On the other hand, an ordinance is vague in all its applications where "it subjects the exercise of [a] right . . . to an unascertainable standard," *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), or if, in other words, "'men of common intelligence must necessarily guess at its meaning,'" *id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

When considering whether a statute is vague in all its applications, "a reviewing court should examine the complainant's conduct *before* analyzing other hypothetical applications of the law because a [party] who engages in some conduct that is *clearly* proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Roark & Hardee*, 522 F.3d at 546 (quoting *Hoffman*, 455 U.S. at 497) (quotation marks and alterations omitted). Where consti-

---

[7] (...continued)
of the facts of the case at hand.").

[8] *See Roark & Hardee*, 522 F.3d at 551 n.19.

tutionally protected conduct is not threatened and "at least some of [the defendant's] conduct is clearly proscribed" by the statute under review, it cannot be void for vagueness. *Id.* at 547.

## III.

With the above framework in mind, we proceed to consideration of § 1328. It is constitutionally sound.

## A.

The first question, as explained above, is the overbreadth question: Does the statute reach a substantial amount of constitutionally protected activity? As we have said, overbreadth is relevant only to First Amendment challenges, *Salerno*, 481 U.S. at 745, but assuming *arguendo* that overbreadth applied in this case, we examine Clark's contention that the statute's reference to "immoral purposes" threatens to chill a constitutional right to engage in fornication and similar sexual activity. Specifically, Clark marshals cases such as *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (creating a right to contraceptives under the Equal Protection Clause), and *Lawrence v. Texas*, 539 U.S. 558 (2003) (creating a Due Process Clause right to homosexual sodomy), for the proposition that the immoral purposes § 1328 covers are protected.

In *United States v. Bitty*, 208 U.S. 393 (1908), the Court construed § 1328 "in accordance with the familiar rule of *ejusdem generis*," concluding that "the immoral purpose referred to by the words 'any other immoral purpose,' must be one of the same general class or kind as the particular purpose of 'prostitution' specified in the same clause of the statute." *Id.* at 402.[9] The *Bitty* Court held

_____

[9] In *Bitty*, 208 U.S. at 401, the Court adopted a broad definition of "prostitution," taking it to "refer[] to women who, for hire or without hire, offer their bodies to indiscriminate inter-
(continued...)

that "concubinage" ("cohabitation," roughly, in modern terms) was an example of female sexual degradation in the same class as prostitution. Later decisions construing § 1328 in light of *Bitty* reasoned that simple fornication is not similar enough to prostitution to fall within the statute's ambit, *see Hansen v. Haff*, 291 U.S. 559, 562 (1934), but that importation of aliens for polygamy does qualify as an immoral purpose, *Cleveland v. United States*, 329 U.S. 14, 18-19 (1946) (Mann Act). Clark argues that even with *Bitty* and *Hansen* in place, § 1328 threatens to inhibit the exercise of constitutionally protected sexual freedoms.

We disagree. Even if *Bitty* created confusion and left now-protected conduct within the statute's reach, the Court in *Lawrence* preserved *Bitty* and remedied its potential shortcomings. The best way to read *Bitty*, in light of recent developments in the constitutional treatment of sexuality, is not to sweep it away altogether but to graft *Lawrence* onto it. The *Lawrence* majority, at the end of its opinion, 539 U.S. at 578, in explaining the limited breadth of the right it was recognizing, carefully pointed out that the case did "not involve public conduct or prostitution" or "persons who might be injured or coerced." That self-imposed limitation on the breadth of *Lawrence* saves *Bitty* and § 1328.

Thus, in summary, the Court in *Bitty* limited "immoral purpose[s]" in § 1328 to activities like prostitution. There is no overbreadth problem with §1328, because that section, on its face and as limited by *Bitty*, does not "reach a substantial amount of constitutionally protected conduct." *Roark & Hardee*, 522 F.3d at 548.

Therefore, we move to the vagueness challenge. As a threshold matter, Clark must show that the statute is vague *in his case* and that he could not have known that transporting a woman from Africa into virtual sex slavery in the United States was an "immoral purpose." *See Roark & Hardee*, 522 F.3d at 547.

---

[9] (...continued)
course with men." That is the definition the district court used in its jury instruction.

That does not strike us as a hard question. There was ample evidence that Clark tricked his victim into coming to the United States for education, then used fear to control her. He paid for her tuition but expected her to be sexually accessible in exchange, and he appeared to be in the process of manipulating her into becoming a plaything—a concubine, one might say—for himself and his friends. His behavior falls squarely within the scope of the statute as defined by *Bitty*, even in the wake of *Lawrence*.

Nor would Clark fare any better if we were to reach the statute's facial validity. To establish that the statute is facially vague, Clark must show that an ordinary person cannot understand what conduct it prohibits or that the statute encourages arbitrariness and discrimination by law enforcement.[10] It is obvious that most people are capable of analogizing prostitution to other sexual conduct according to criteria of economic exchange, exploitation, and coercion. The definition of "immoral" conduct resembling prostitution may be "imprecise," even as limited by *Bitty*, but it is surely not "[in]comprehensible." *Coates*, 402 U.S. at 614.[11] Unlike the ordinance challenged in *Morales* or *Coates*, § 1328 does not

---

[10] *Grayned*, 408 U.S. at 108-09; *Monroe*, 178 F.3d at 308 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

[11] The government provides a list of statutory phrases that have been saved from vagueness challenges.

> The phrase 'crime involving moral turpitude' presents no greater uncertainty or difficulty than language found in many other statutes repeatedly sanctioned by the Court. The Sherman Act provides the most obvious example, 'restraint of trade' as construed to mean 'unreasonable or undue restraint of trade[.]' Compare other statutory language which has survived attack under the vagueness doctrine in this Court: 'in excess of the number of employees needed by such licensee to perform actual services', 'any offensive, derisive or annoying word', 'connected with or related to the national defense', 'psychopathic personality,' 'willfully overvalues any security,' 'fair and open competition', 'reasonable variations shall be permitted,' 'unreasonable waste of natural gas', 'political purposes,' 'range usually occupied by any cattle grower[.]'

(continued...)

leave the decision of what constitutes an immoral act entirely in the discretion of law enforcement,[12] for the Supreme Court has, again, repeatedly restricted the statute's application to acts resembling prostitution. Clark has certainly not brought any evidence that enforcement of the statute is arbitrary or discriminatory. His own actions fall squarely within § 1328's proscriptions, and the statute is constitutionally valid and was validly applied here.

## IV.

Clark objects to the jury instructions. We review instructions for abuse of discretion, determining whether they provide a correct statement of the law, adequately instruct the jurors, and are factually supportable. In determining whether the evidence supports a given instruction, we evaluate that evidence in the light most favorable to the government. *United States v. Skilling*, 554 F.3d 529, 547 (5th Cir. 2009), *pet. for cert. filed,* 77 U.S.L.W. 3645 (May 11, 2009). To decide whether the instructions gave the jurors an adequate picture of the relevant law, we consider all the evidence in context, including the lawyers' arguments to the jury. *United States v. Chagra*, 807 F.2d 398, 402-03 (5th Cir. 1986).

The court quoted the language from *Bitty* referring to "conduct of the same general class or kind as prostitution." That class, the district court said, "includes importing an alien for the purpose of sexual exploitation." Sexual exploitation, the court then explained, is "to use a person unjustly for one's advantage in a manner associated with or related to sex."

Clark makes strained semantic arguments to the effect that the instructions left the jury with unfettered discretion to convict based on its own views

---

[11] (...continued)
*Jordan v. DeGeorge*, 341 U.S. 223, 231 n.15 (1951). If those statutes could stand, then § 1328 surely does.

[12] *See Morales*, 527 U.S. at 61-63; *Coates*, 402 U.S. at 614.

of sexual morality. All the evidence presented at trial (as well as the government's jury arguments), however, pointed to Clark's importing an alien for purposes of prostitution and "sexual exploitation" as the district court defined it.

The government never argued that Clark and Njau were in an immoral but consensual relationship, and the prosecution elicited no evidence from Njau to support such an argument. To the contrary, the government consistently emphasized Njau's fear and suffering. In closing, it argued that Clark had gone to Kenya looking for a prostitute and that he had believed that Njau would be willing to repay her scholarship with sex. At *voir dire*, furthermore, the government asked questions calculated to eliminate from the jury persons who were inclined to convict defendants based on fornication alone.

"Sexual exploitation," of course, is a fair description of several categories of sexual relationships left unprotected by *Lawrence*, and, in light of the entire record, the chance that the jury convicted Clark of importing Njau for purposes of extramarital consensual sex—which is what Clark seems to be implying—is small indeed. *See Chagra*, 807 F.2d at 402-03. Those instructions are therefore perfectly supportable under the facts and the caselaw; certainly it was within the district court's "substantial latitude" to phrase the charge in that way. *Skilling*, 554 F.3d at 547 (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1510 (5th Cir. 1996)).

Clark also complains that the jury instruction was vague because it defined sexual exploitation with reference to the concept of "justice." The instruction, however, was not a simple exhortation to "justice" or "reasonableness." *See United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921). When fleshed out by context and record evidence, references to general concepts of good conduct do not necessarily create vagueness in statements of the law.[13] References to social

---

[13] *See United States v. Escalante*, 239 F.3d 678, 680 (5th Cir. 2001) (upholding a statute (continued...)

standards are permissible by the same token.[14] Though views on sexual morality obviously vary widely, the district court anchored the statute's reference to "immorality" to prostitution and coercion. That adequately set the jury's frame of reference.

V.

Clark objects to an evidentiary ruling. At trial, a congregant at the church where he was a minister testified that Clark had spoken in his public sermons of having shot "hoodlums" for revenge and of being narrowly dissuaded from shooting other people who had hurt a family member. Clark's counsel objected on relevance grounds, but the court admitted the testimony. Clark argues that the testimony was evidence of prior bad acts that served only to illustrate his character and so was inadmissible under Federal Rule of Evidence 404(b).

Evidence of prior bad acts is admissible if relevant for a rule 404(b) permissible purpose and not unduly prejudicial under rule 403 balancing. *United States v. Pompa*, 434 F.3d 800, 805 (5th Cir. 2005). A general "relevance" objection, however, does not adequately implicate rule 404(b).[15] We therefore review admission of the bad acts testimony for plain error only.

"To prove plain error, [Clark] must show (1) there was error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings."

---

[13] (...continued)
forbidding "careless or imprudent [driving] . . . without due regard for [road conditions generally]").

[14] *Id.* ("This ubiquitous standard does not defy common understanding but relies on it. In the context of rules of the road, few people misapprehend what constitutes careful driving and what does not.").

[15] *United States v. Greenwood*, 974 F.2d 1449, 1462 (5th Cir. 1992); *United States v. Marrero*, 904 F.2d 251, 259 & n.8 (5th Cir. 1990).

*United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008) (quotation marks omitted), *petition for cert. filed* (Feb. 12, 2009) (No. 08-8714). Even if such an error occurred, the decision to grant relief is entirely discretionary. *United States v. Olano*, 507 U.S. 725, 735-36 (1993).

The government contends, and we agree, that the congregant's testimony substantiated Njau's report that Clark had implied that he would shoot her if she did not comply with his demands. The fact that he has threatened to shoot people before was relevant to show his intent to threaten Njau. That, in turn, makes it more likely that Clark brought Njau to the United States to exploit her.[16] Thus the testimony was probative of more than Clark's character. Certainly any error was not plain.

In summary, there is no reversible error, and the judgment of conviction is AFFIRMED.

---

[16] *See United States v. Jamison*, 299 F.3d 114, 121 n.3 (5th Cir. 2002) (holding evidence of prior armed robbery relevant to show intent to "commit [another] robbery or to possess a weapon illegally").