Jane ROE II, Petitioner,

v.

Robert BUTTERWORTH, Attorney General of the State of Florida, Respondent.

No. 94–8681–CIV–GONZALEZ.

United States District Court, S.D. Florida.

March 10, 1997.

**1570**

Elliot S. Shaw, Taplin Howard & Shaw, P.A., West Palm Beach, FL, for Plaintiff.

Parker D. Thomson, Thomson, Muraro, Razook & Hart, P.A., Miami, FL, John P. Goshgarian, Florida Attorney General's Office, Dept. of Legal Affairs, Civil Division, Ft. Lauderdale, FL, for Defendant.

GONZALEZ, District Judge.

## FINAL ORDER

This Cause has come before the Court upon Petitioner's Motion for Summary Judgment, filed on April 16, 1996, and Respondent's Cross–Motion for Summary Judgment, filed on July 19, 1996. Both motion have been fully briefed and are ripe for review. Additionally, the parties agree that no material factual disputes exist in this case, that the issues presented are entirely questions of law, and that the case is ripe for adjudication. Petitioner's Motion for Summary Judgment, at 1; Respondent's Cross–Motion for Summary Judgment and Supporting Memorandum of Law, at 1 (hereinafter "Respondent's Memorandum").

## I. PROCEDURAL BACKGROUND AND FACTS

In a simple two page complaint, Petitioner challenges the constitutionality of Chapter 796, Florida Statutes, and seeks declaratory and injunctive relief against Robert Butterworth, acting as Attorney General of the State of Florida. Petitioner brings her claims under the Fifth and Fourteenth Amendments to the United States Constitution.[1]

Petitioner is a former employee of the "most prestigious and famous escort service in south Florida and the United States...." Petitioner's Affidavit (DE 10), ¶ 4. According to Petitioner, during her employment as a call girl, she "dated and engaged in sexual activity for hire with some of the most powerful and well known businessmen in the United States and the World as well as numerous diverse professionals such as doctors, lawyers, reverends and ministers, professors and even State Circuit Court and Federal Judges," most of whom were married. Id., ¶ 5. Petitioner is interested in returning to her career as a prostitute, but has refrained from doing so at the prompting of her attorney, and out of fear of prosecution. Id., ¶ 13.

---

1. Since Petitioner's claim is brought only against the State of Florida through its Attorney General, it is only cognizable pursuant to the Fourteenth Amendment. *See Barron v. City of Baltimore,* 32 U.S. 243, 7 Pet. 243, 8 L.Ed. 672 (1833).

Florida defines prostitution as "the giving or receiving of the body for sexual activity for hire but excludes sexual activity between spouses." Fla.Stat. § 796.07(1)(a). "Sexual activity" is defined as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another; anal or vaginal penetration of another by any other object; or the handling or fondling of the sexual organ of another for the purpose of masturbation...." Fla.Stat. § 796.07(1)(d). Section 796.07 also makes it unlawful for any person to "purchase the services of any person engaged in prostitution." Fla.Stat. § 796(2)(h)(i). Violation of Section 796.07 constitutes the commission of a misdemeanor. Fla.Stat. § 796.07(4). The remainder of Chapter 796 deals with other offenses that are related to prostitution.

In her Complaint, Petitioner alleges that sections 796.02 through 796.08 "to the extent they prohibit and make criminal prostitution and acts related thereto criminal, are unconstitutional because they directly violate the Petitioner's Fifth and Fourteenth Amendment rights to due process and equal protection and her fundamental right of privacy, and pursuant to that right[, the right] to control her own reproductive organs whether in a private or commercial transaction." Petitioner's Complaint, ¶¶ 2, 7. Following this Court's denial of Respondent's Motion to Dismiss, and subsequent Motion for Reconsideration, Petitioner filed its Motion for Summary Judgment. Respondent responded with its Cross–Motion for Summary Judgment shortly thereafter.

## II. LEGAL STANDARD FOR CONSIDERING A MOTION FOR SUMMARY JUDGMENT

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The stringent burden of establishing the absence of a genuine issue of material

fact lies with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), and any doubts in this regard should be resolved against the moving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2553.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). According to the plain language of Fed.R.Civ.P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).[2] If the evidence advanced by the

---

**2.** The standard for granting summary judgment mirrors the standard for directing a verdict un-

der Fed.R.Civ.P. 50(a). *Anderson v. Liberty Lob-*

non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511.

## III. IS PETITIONER'S CLAIM JUSTICIABLE?

■■■ Before this Court may address the constitutional issues raised by Petitioner, it must determine whether a sufficient case or controversy exists to satisfy Article III, § 2 of the United States Constitution, and whether Petitioner has standing to challenge the enforcement of Fla. Stat. § 769.07 (1995).[3] A federal court may only "adjudge the legal rights of litigants in actual controversies." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). "[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971). As stated by the Supreme Court:

> The difference between an abstract question and a "case or controversy" is one of degree, of course, and is not discernible by any precise test. *See Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The basic inquiry is whether the "conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Railway Mail Assn. v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945); *see Evers v. Dwyer,* 358 U.S. 202, 203, 79 S.Ct. 178, 179, 3 L.Ed.2d 222 (1958); *Maryland Casualty Co. v. Pacific Coal & Oil Co., supra.*

*by, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**3.** The justiciability concepts of "standing" and "ripeness" are interrelated; both are aimed at insuring that the court is presented only with concrete disputes. *Wilderness Society v. Alcock,* 83 F.3d 386, 390 (11th Cir.1996); *Doe v. Duling,* 782 F.2d 1202, 1206 n. 2 (4th Cir.1986); John E. Nowak and Ronald D. Rotunda, *Constitutional Law,* § 2.12, at 68–91 (5th ed.1995). Thus, both

*Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

■ Petitioner has not been prosecuted, nor is she in immediate threat of prosecution for violating the statute she challenges. However, "it is not necessary that petitioner first expose [herself] to actual arrest or prosecution to be entitled to challenge a statute that [s]he claims deters the exercise of [her] constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974), citing *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Instead, she may maintain an action so long as she has "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. ..." *Athens Lumber Co., Inc. v. Federal Election Commission,* 689 F.2d 1006 (11th Cir.1982) (citations omitted), *aff'd on reh'g,* 718 F.2d 363 (1983), *cert. denied,* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984).

■ In this case, Petitioner alleges that she desires to engage in conduct prohibited by § 769.07, and that she currently refrains from doing so out of fear of prosecution. Respondent has indicated that it will continue to enforce the challenged ordinance. Thus, Petitioner is being forced to chose between complying with § 769.07 and suffering economic injury, or facing the risk of prosecution. *See American Booksellers Association, Inc. v. Virginia,* 792 F.2d 1261, 1264 (4th Cir.1986), *superseded,* 802 F.2d 691 (4th Cir.1986). In this posture, Petitioner's injury and fear of prosecution is more than "chimeral," *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961), and satisfies the Constitution's requirement that

require a showing of actual or threatened injury. *Wilderness Society,* at 390; *Doe,* at 1206 n. 2. "When determining standing, a court asks whether these persons are the proper parties to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered the harm. *See* Erwin Chemerinsky, Federal Jurisdiction § 2.4.1 (1989). When determining ripeness, a court asks whether this is the correct time for the complainant to bring the action." *Wilderness Society,* at 390.

she have "such a personal stake in the outcome of the controversy to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker,* 369 U.S. at 204, 82 S.Ct. at 703. Petitioner has shown the existence of a "threatened injury as a result of the putatively illegal conduct of the defendant" which can "fairly can be traced to the challenged action" and is "likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976); *GTE Directories Publishing Corp. v. Trimen America, Inc.,* 67 F.3d 1563, 1567 (11th Cir. 1995). Therefore, the Court concludes both that an actual controversy exits in this case, and that Petitioner has standing to bring the present action. *Accord Doe v. Gonzalez,* 723 F.Supp. 690, (S.D.Fla.1988), *aff'd,* 886 F.2d 1323 (11th Cir.1989).

## IV. DOES THE FUNDAMENTAL RIGHT TO PRIVACY COVER PROSTITUTION?

As an initial matter, the Court must determine the proper standard for reviewing Petitioner's claims. If, as Petitioner asserts, the conduct in which she wishes to engage falls within the zone of privacy protected by the Fifth and Fourteenth Amendments to the United States Constitution, the Court must engage in a two part analysis. Initially, the Court must determine whether the challenged legislation burdens the exercise of Petitioner's right of privacy. If the Court answers this question in the affirmative, it must strictly scrutinize the legislation to determine if it is narrowly tailored to achieve a compelling state interest. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 37, 93 S.Ct. 1278, 1299, 36 L.Ed.2d 16 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 498, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); *Church of*

*the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546, 113 S.Ct. 2217, 2233, 124 L.Ed.2d 472 (1993). If the Court concludes that the activity in which Petitioner seeks to engage does not fall within the ambit of her fundamental right of privacy, or that the legislation does not burden any fundamental right, the Court must determine whether the statute is rationally related to a legitimate governmental interest. *Bowers v. Hardwick,* 478 U.S. 186, 193, 106 S.Ct. 2841, 2845, 92 L.Ed.2d 140 (1986); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Tarter v. James,* 667 F.2d 964, 969 (11th Cir.1982); John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 14.3 (5th ed.1995).

Even before it determines what level of review to apply, however, the Court must identify the exact nature of the right Petitioner asserts. In large part, the Court's conclusion will turn upon the level of specificity with which it views Petitioner's claim; the Court must determine whether to view Petitioner's claim at a very general level—as a unitary whole—or at a more specific level. In other words, is the issue in this case whether Petitioner has a constitutional right to engage in prostitution? Or should that activity be broken down into its constituent parts?

Frequently, as a claim is viewed more generally, its nature becomes more consistent with a fundamental right. This problem was recognized by Justice Scalia in *Michael H. v. Gerald D.,* when he wrote:

We do not understand why, having rejected our focus upon the societal tradition regarding the natural father's rights vis-a-vis a child whose mother is married to another man, Justice BRENNAN would choose to focus instead upon "parenthood." Why should the relevant category not be even more general—perhaps "family relationships"; or "personal relationships"; or even "emotional attachments in general"? Though the dissent has no basis for the level of generality it would select, we do: We refer to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified. If, for example, there were no

societal tradition, either way, regarding the rights of the natural father of a child adulterously conceived, we would have to consult, and (if possible) reason from, the traditions regarding natural fathers in general. But there is such a more specific tradition, and it unqualifiedly denies protection to such a parent.

491 U.S. 110, 126 n. 6, 109 S.Ct. 2333, 2344 n. 6, 105 L.Ed.2d 91 (1989). *See also, Id.*, at 137–38, 109 S.Ct. at 2349–50 (Brennan, J., dissenting).

Justice Scalia's formulation was not adopted by the majority of the Court in *Gerald D.*, and was later rejected in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992). Yet there remains a strong precedent in favor of selecting the most specific level of tradition possible for adjudicating this case—*Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

In *Bowers*, the Court rejected Hardwick's challenge to Georgia's anti-sodomy law. Hardwick, who had been arrested for committing an act of sodomy with another adult male in the privacy of his own bedroom, argued that the statute violated his constitutional right to privacy. *Id.*, at 187, 106 S.Ct. at 2842. In his dissent, Justice Blackmun argued that Hardwick's claim should be viewed at a very general level as "'the right to be let alone.'" *Id.*, at 199, 106 S.Ct. at 2848, quoting *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, (1928) (Brandeis, J., dissenting). The Court, however, rejected Justice Blackmun's formulation, and instead framed the issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy...." *Id.*, at 190, 106 S.Ct. at 2843. Thus, the Court viewed Hardwick's claim at a very specific level, taking into consideration all of the relevant facts of which the State complained. Thus, it is clear that the Court does not inevitably limit its inquiry to general, overriding principles of privacy.

Initially, Petitioner presented her claim as a coherent activity. Later, perhaps in response to this Court's recognition that Petitioner's claim could·be based upon "some smaller subset of personal rights," she directed greater attention to this alternative theory. Petitioner has, however, included arguments supporting each approach in her memoranda. Because the Court believes that it would be helpful to explore both of Petitioner's approaches, it will consider each in turn.

## A. What constitutes a fundamental right?

It is never easy for a court to determine whether a particular activity, previously unaddressed by the Supreme Court, falls within one of the "unenumerated rights" created by the Constitution. Some restrictions on the state were made unmistakably clear by the framers. *See* United States Constitution, Art. I, § 10. As for other restrictions upon state legislation, the Constitution has at times appeared miserly, only begrudgingly revealing her mysteries.

The unenumerated rights upon which the states are forbidden from intruding are most often found as stemming from the Due Process Clauses of the Fourteenth Amendment. *But see Griswold v. Connecticut, supra.* The confusion over the scope of rights protected by the imprecise language of this provision has caused more than a few disagreements in the Supreme Court over the years. *See Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *Olsen v. State of Nebraska ex rel. Western Ref. & Bond Ass'n*, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949); *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); *Adamson v. California*, 332 U.S. 46, 68–92, 67 S.Ct. 1672, 1683–97, 91 L.Ed. 1903 (1947) (Black, J., dissenting); *Michael H. v. Gerald D.*, 491 U.S. at 126 n. 6, 109 S.Ct. at 2344 n. 6 (Scalia, J.). Read literally, the Due Process Clause seems to be a procedural provision, merely limiting the manner in which a state may deprive a per-

son of "life, liberty, or property". For at least 109 years, however, "the Clause has been understood to contain a substantive component as well, one 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986), *quoted in Planned Parenthood v. Casey,* 505 U.S. at 846, 112 S.Ct. at 2804, citing *Mugler v. Kansas,* 123 U.S. 623, 660–661, 8 S.Ct. 273, 296–297, 31 L.Ed. 205 (1887). The due process clause of the Fourteenth Amendment "affords not only a procedural guarantee against deprivation of 'liberty,' but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State." *Kelley v. Johnson,* 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976).

In evaluating Petitioner's claim, the Court must ask whether the liberty she asserts is "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (Cardozo, J.), *quoted in, Michael H. v. Gerald D.,* 491 U.S. at 122, 109 S.Ct. at 2342. Only if the right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,'" will it be deemed fundamental. *Powell v. State of Alabama,* 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158 (1932), *quoted in Griswold v. Connecticut,* 381 U.S. at 493, 85 S.Ct. at 1686–87 (Goldberg, J., concurring). In determining whether a right is so "implicit in the concept of ordered liberty" as to warrant constitutional protection, the Court should refer to this Nation's history, and basic underlying values. *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937); *Griswold v. Connecticut,* at 501, 85 S.Ct. at 1690 (Harlan, J., concurring); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). Also, the Court must maintain a "wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms." *Id.* After referring to these sources of guidance, a fundamental right will only be found

if the Court concludes that the liberty asserted is of such importance that "neither liberty nor justice would exist if [it] were sacrificed." *Palko v. Connecticut,* 302 U.S. at 326, 58 S.Ct. at 152. As stated by Justice Harlan:

> Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint.
>
> ... [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

*Poe v. Ullman,* 367 U.S. at 542–43, 81 S.Ct. at 1776–77, (Harlan, J., dissenting), *quoted in*

*Planned Parenthood v. Casey,* 505 U.S. at 849–50, 112 S.Ct. at 2805.

At issue in this case is the Due Process Clause's substantive guarantee of liberty, which has been interpreted as including a right of privacy protecting "the personal intimacies of the home, the family, marriage, motherhood, procreation,... child rearing", and education. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973).[4] These protected intimacies were, for a long time, limited to the marital relationship. *See e.g., Skinner v. Oklahoma,* 316 U.S. at 541, 62 S.Ct. at 1113 (1942); *Griswold v. Connecticut,* 381 U.S. at 486, 495, 85 S.Ct. at 1682, 1687. The Court's opinion in *Eisenstadt v. Baird,* however, made clear that this right "to be let alone" means more: "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. at 453, 92 S.Ct. at 1038, citing *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Jacobson v. Massachusetts,* 197 U.S. 11, 29, 25 S.Ct. 358, 362, 49 L.Ed. 643 (1905).

Recognizing that the interpretation of the Due Process Clause is not a precise science, the Supreme Court has admonished lower courts to exercise extreme caution before extending that Clause's reach. Such circumspection is dictated by the nature of the government the Constitution established. Under our representative democracy, courts must be particularly careful to leave important political decisions in the hands of the majority. See John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review,* 100–01 (1980). Thus, the Court has warned:

> The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution. That this is so was painfully demonstrated by the face-off between the Executive and the Court in the 1930's, which resulted in the repudiation of much of the substantive gloss that the Court had placed on the Due Process Clauses of the Fifth and Fourteenth Amendments. There should be, therefore, great resistance to expand the substantive reach of those Clauses, particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority.

*Bowers v. Hardwick,* 478 U.S. at 194–195, 106 S.Ct. at 2846; *see also Michael H. v. Victoria D.,* 491 U.S. at 121–22, 109 S.Ct. at 2341–42; *Moore v. City of East Cleveland,* 431 U.S. 494, 544, 97 S.Ct. 1932, 1958, 52 L.Ed.2d 531 (1977) (White, J., dissenting). Bearing this warning in mind, the Court shall now consider Petitioner's claims.[5]

**B. Does Petitioner have a fundamental right to engage in prostitution?**

■ Petitioner argues that prostitution is so well established in the traditions and history of this society as to come within the protection of Due Process Clause's guarantee

---

4. *See e.g. Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, (1925) (child rearing and education); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (same); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (family relationships); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (procreation); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (marriage); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (contraception); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (same); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (abortion).

5. Unfortunately, it is difficult to ascertain the precise nature of many of the arguments advanced by Petitioner. Additionally, the relevance of many of the exhibits submitted by Petitioner is so attenuated that they serve little purpose. When a party fails to carefully define the legal issues in her case, and fails to marshal relevant facts in support of her claims, it exacerbates the Court's already difficult task of analyzing complex constitutional claims. In legal memoranda, perhaps more than anywhere else, one should stick to the well worn precept: "quality, not quantity."

of privacy. Her supporting references to "evidence" reach back millions of years to the development of Homo Erectus. She also refers to ancient Greek history, Roman Mythology, the Bible, biblical scholars such as St. Thomas Aquinas and St. Augustine, and the history of the old American West. Petitioner has submitted ample evidence to establish that prostitution has an extensive and lengthy history; this is no surprise. Yet she has utterly failed to show either that the act of engaging in prostitution is "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if [it] were sacrificed," or that it is so "deeply rooted in this Nations's history and tradition" as to be deemed fundamental. *Palko, Moore, supra.* Indeed, such an argument "is, at best, facetious." *Bowers v. Hardwick,* 478 U.S. at 194, 106 S.Ct. at 2846.

Longevity alone does not bring an activity within the protection of the Constitution. If it did, every activity that has long been denounced by civilized societies—and they are myriad—would gain constitutional protection from state interference. Murder, robbery, extortion, bigamy, incest, theft, and many other crimes have been committed since before histories were recorded. Yet, because societies considered them destructive, immoral, indecent, or generally evil, they have all been prohibited at one time or another. The same is undoubtedly true of prostitution.

Petitioner does not contest the long standing history of state and criminal laws prohib-

iting prostitution in this country. Today, every state in the Union, as well as the federal government, has some form of penal statute prohibiting prostitution. Such a well established history of prohibition strongly supports the conclusion that this society has not traditionally valued the practice of prostitution.

Petitioner's references to the Bible are also completely unavailing. The Bible is replete with negative references to "harlots," "prostitutes" and "whores," both in the Old and New Testament.[6] The mere fact that "harlots" may not have been "systematically repressed," or that particular prostitutes, such as Rehab, were even revered, falls far short of establishing that the institution of prostitution is "implicit in the concept of ordered liberty." *See* Petitioner's Brief, at 84.

Petitioner's own exhibits demonstrate the public opprobrium that has been leveled towards prostitution throughout history. Indeed, the main thrust of Petitioner's argument is that such malevolent judgments, so common throughout history, stem from antiquated and hypocritical attitudes and ethics. While such an argument shows that societal norms do not mesh with Petitioner's liberalized ideals, it does nothing to advance her claim that the right to engage in prostitution is constitutionally protected.

Petitioner's reliance on the privacy of the home or other closed quarters also fails to persuade this Court that prostitution is con-

---

6. *See e.g.,* 1 Cor:6:15 ("Know ye not that your bodies are the members of Christ? Shall I then take the members of Christ, and make them the members of an harlot? God forbid."); Gen:38:24 ("And it came to pass about three months after that, that it was told to Judah, saying, Tamar thy daughter in law hath played the harlot; and also, behold, she is with child by whoredom. And Judah said, Bring her forth, and let her be burnt."); Prov:7:10 ("Whoso loveth wisdom rejoiceth his father: but he that keepeth company with harlots spendeth his substance."); Lev:19:29 ("Do not prostitute thy daughter, to cause her to be a whore; lest the land fall to whoredom, and the land become full of wickedness"); Lev:21:9 ("And the daughter of any priest, if she profane herself by playing the whore, she shall be burnt with fire."); Deut:22:21 ("Then they shall bring out the damsel to the door of her father's house, and the men of her city shall stone her with stones that she die: because she hath wrought folly in Israel, to play the whore in her father's house: so shalt thou put evil away from among you."); Deut:23:17 ("There shall be no whore of the daughters of Israel, nor a sodomite of the sons of Israel."); Deut:23:18 ("Thou shalt not bring the hire of a whore, or the price of a dog, into the house of the LORD thy God for any vow: for even both these are abomination unto the LORD thy God."); Prov:23:27 ("For a whore is a deep ditch; and a strange woman a narrow pit."); Jer:3:2 ("... thou has polluted the land with thy whoredoms and with thy wickedness."); Jer:12:27 ("I have seen thine adulteries, and thy neighings, they lewdness of thy whoredom, and thine abominations on the hills in the fields. Woe unto thee, O Jerusalem! Wilt thou not be made clean?"); Ezek:16:26 ("Thou hast also committed fornication with the Egyptians thy neighbors, great of flesh; and hast increased thy whoredoms, to provoke me to anger.").

stitutionally protected. While the Supreme Court has given a more expansive reading to the right of privacy when a challenged ordinance seeks to reach within an individual's home, *see Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Court has also made clear that the privacy of one's home does not render an individual immune from prosecution. *Bowers v. Hardwick*, 478 U.S. at 193, 106 S.Ct. at 2845.[7] Even "[v]ictimless crimes … do not escape the law where they are committed at home." *Id.*; *See also, Employment Div., Dept. Of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (recognizing the state's legitimate interest in preventing the use of illegal drugs even in the home).

Other Supreme Court cases give further support for rejecting Petitioner's claim. Various Justices of the Supreme Court, both in separate opinions and on behalf of the Court, have stated that the states may appropriately criminalize prostitution. *See e.g. Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 594, 111 S.Ct. 2456, 2475, 115 L.Ed.2d 504 (1991) (White, J., dissenting) ("the State clearly has the authority to criminalize prostitution and obscene behavior"); *Id.*, 501 U.S. at 575, 111 S.Ct. at 2465 (Scalia, J., concurring); *Id.*, 501 U.S. at 584, 111 S.Ct. at 2469 (Souter, J., concurring); *Paris Adult Theatre I · v. Slaton*, 413 U.S. 49, 68 n. 15, 93 S.Ct. 2628, 2641 n. 15, 37 L.Ed.2d 446 (1973) ("The state statute books are replete with constitutionally unchallenged laws against prostitution, … although [this] crime[ ] may only directly involve 'consenting adults.'"); *Hoke v. United States*, 227 U.S. 308, 321, 33 S.Ct. 281, 283, 57 L.Ed. 523 (1913) ("There is unquestionably a control in the states over the morals of their citizens, and, it may be admitted, it extends to making prostitution a crime."). *See also Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986); *United States v. Bitty*, 208 U.S. 393, 401, 28 S.Ct. 396, 398, 52 L.Ed. 543 (1908); *Caminetti v. United States*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

Various justices have also expressed the view that other extra-marital sexual crimes are valid and enforceable. *See Carey v. Population Services, Int'l*, 431 U.S. 678, 702, 97 S.Ct. 2010, 2025, 52 L.Ed.2d 675 (1977) (White, J., concurring) ("I do not regard the opinion, however, as declaring unconstitutional any state law forbidding · extramarital sexual relations."); *Paris Adult Theatre I*, 413 U.S. at 68 n. 15, 93 S.Ct. at 2641 n. 15 ("Statutes making bigamy a crime surely cut into an individual's freedom to associate, but few today seriously claim such statutes violate the First Amendment or any other constitutional provision."); *Griswold v. Connecticut*, 381 U.S. at 498, 85 S.Ct. at 1689 (Goldberg, J., concurring) ("The State of Connecticut does have statutes, the constitutionality of which is beyond doubt, which prohibit adultery and fornication."); *Id.*, at 505, 85 S.Ct. at 1693 (White, J., concurring) ("the State's policy against all forms of promiscuous or illicit sexual relationships … [is] concededly a permissible and legitimate legislative goal."); *Poe v. Ullman*, 367 U.S. at 552, 81 S.Ct. at 1782 (Harlan, J., dissenting) ("I would not suggest that adultery, homosexuality, fornication and incest are immune from criminal enquiry, however privately practiced."), *quoted in* Catherine D. Perry, "Right of Privacy Challenges to Prostitution Statutes," 58 Wash.U.Law.Quarterly 439, 456 n. 120. Even Justice Blackmun, dissenting in *Bowers v. Hardwick*, suggested that the a state could legitimately enforce such laws. 478 U.S. at 209 n. 4, 106 S.Ct. at 2853 n. 4.

Petitioner has utterly failed to show that this society has ever recognized a right to engage in prostitution; instead, she has painted a picture of consistent and long standing denunciation. While she has shown that the roots of prostitution reach well back into ancient history, she has failed to shown that "neither liberty nor justice would exist if [it] were sacrificed." Therefore, following the reasoning and analysis of the Supreme Court in *Bowers v. Hardwick*, the Court concludes that Petitioner has failed to show that the right of privacy, as delineated by the

---

**7.** Petitioner stringently argues that this Court should abandon *Bowers*. That case, however, has never been overruled, and unless and until it is, it remains binding on this Court. The intimation that this Court could overrule a valid Supreme Court case is preposterous.

Supreme Court, includes the right to engage in prostitution.

## C. Is engaging in sex a fundamental right?

■ Whether the right of privacy includes the right to engage in extra-marital sexual relations between consenting, heterosexual adults is a much more difficult question, and one which the Supreme Court has refused to resolve. *See Bowers v. Hardwick,* 478 U.S. at 187 n. 2, 106 S.Ct. at 2842 n. 2; *Eisenstadt v. Baird,* 405 U.S. at 451 n. 8, 92 S.Ct. at 1037 n. 8. The lower courts that have considered this issue have reached different conclusions. *See J.B.K., Inc. v. Caron,* 600 F.2d 710, 711 (8th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980); *Doe v. Duling,* 603 F.Supp. 960 (E.D.Va. 1985), *vacated on jurisdictional grounds,* 782 F.2d 1202 (4th Cir.1986); *Baker v. Wade,* 553 F.Supp. 1121 (N.D.Tex.1982), *rev'd* 769 F.2d 289 (5th Cir.1985), *reh'g denied* 774 F.2d 1285 (5th Cir.1985); *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); *Lovisi v. Slayton,* 363 F.Supp. 620 (E.D.Va. 1973), *aff'd,* 539 F.2d 349 (4th Cir.1976), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976).

Petitioner states unequivocally that "[t]he United States Supreme Court has repeatedly, without fail, ruled that the right to have sex is a fundamental constitutional right independent of *Roe v. Wade* and *Casey.*" Petitioner's Brief, at 12. This conclusion, however, is not supported by even the most strained reading of the cases Petitioner cites. In fact, as pointed out above, several of those cases contain statements suggesting that the Supreme Court would uphold the constitutionality of adultery and fornication statutes. Nonetheless, a strong argument can be made that the right to personal intimacy and privacy is broad enough to protect from state intrusion or interference the consensual sexual relations of heterosexual adults. Fortunately, the Court need not consider that argument at this time, for even assuming the existence of such a fundamental right, Petitioner's challenge to Florida's prostitution statute fails.

As a general matter, when a state law abridges a fundamental personal liberty "the State may prevail only upon showing a subordinating interest which is compelling." *Griswold v. Connecticut,* 381 U.S. at 497, 85 S.Ct. at 1688 (Goldberg, J., concurring) (citations omitted). This strict level of review, however, is not triggered automatically. Obviously, "not every law which makes a right more difficult to exercise is, *ipso facto,* an infringement of that right." *Planned Parenthood v. Casey,* 505 U.S. at 873, 112 S.Ct. at 2818. Only where a state law "imposes an undue burden" on the exercise of a fundamental right "does the power of the State reach into the heart of the liberty interest protected by the Due Process Clause." *Id.,* at 874, 112 S.Ct. at 2819 (citations omitted). If a state law has only incidental effects upon the exercise of a fundamental right, a court will not review that law at the strictest level of scrutiny. *Id.,* at 833, 112 S.Ct. at 2791. Instead, the state need only show that the statute is rationally related to a legitimate state purpose.

Petitioner has not show that the challenged statute has placed a "substantial obstacle in the path" of her decision to engage in consensual sexual activities, nor has she raised such a claim on behalf of another.[8] *Id.,* at 875, 112 S.Ct. at 2820. Chapter 769 of the Florida Statutes simply does not prevent Petitioner from engaging in sex.[9] On the contrary, Petitioner apparently has so little trouble obtaining willing partners for sexual intercourse that they are willing to pay her for the privilege. Thus, Petitioner has not shown even a marginal infringement of the claimed fundamental right.[10]

---

**8.** It is doubtful that Petitioner has standing to raise such a claim. *See Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976).

**9.** At least one other Court has reached a similar conclusion. *See Cherry v. Koch,* 129 Misc.2d 346, 491 N.Y.S.2d 934, 943 (N.Y.Sup.Ct.1985),

*aff'd as modified,* 126 A.D.2d 346, 514 N.Y.S.2d 30, and *appeal denied,* 70 N.Y.2d 603, 518 N.Y.S.2d 1026, 512 N.E.2d 552.

**10.** This case differs greatly from the abortion and contraception cases in that, unlike here, the exercise of the right asserted in those cases depends upon the purchase of the services or products of

Petitioner's true complaint is that she is forbidden from profiting financially from engaging in sex. In essence, she argues that "[t]he right to purchase and sell labor is part of the liberty protected by [the Fourteenth] [A]mendment." *Lochner v. New York,* 198 U.S. 45, 53, 25 S.Ct. 539, 541, 49 L.Ed. 937 (1905). Viewed in this light, Petitioner's claim fits neatly within the economic · due process line of cases announced by the Supreme Court during the early part of this century. *See Id; Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897); *Adair v. United States,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908); *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915); *Adkins v. Children's Hospital,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923). Obviously, it is beyond the power of this Court to breathe new life into these long discredited cases. *See Ferguson v. Skrupa,* 372 U.S. 726, 731–32, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963).

As the law stands today, "a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare." *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934). If the means selected "have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.*" *Id.,* at 537, 54 S.Ct. at 516. It is not the function of a court to sit as a super legislature judging the "wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes,*

427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Following the dictate of these cases, the Court is bound to give great deference to the State's economic regulations, and presume the existence of facts supporting the legislature's judgment. *See Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Thus, the Court's inquiry is "restricted to the issue whether any state of facts either known or which could reasonably be assumed, affords support" for the challenged statute. *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938), *quoted in,* Nowak & Rotunda, *supra,* at 386.[11]

The dictate of these cases is clear: this Court shall not second guess the collective decision of the citizens of Florida to prohibit the sale or purchase of sexual services. So long as any reasonable basis for this prohibition can be advanced or even hypothesized, the law must be declared valid. In summary, the Court holds that: (1) there is no constitutionally protected right to engage in prostitution; and (2) even assuming that the fundamental right of privacy includes consensual heterosexual sexual relations between adults, Petitioner has failed to show that Chapter 796 of the Florida Statutes interferes with that right.

## V. THE LAW AS APPLIED TO THIS CASE

Petitioner has raised both a due process and equal protection challenge to Florida Statutes Chapter 796. The latter challenge is based upon the fact that Fla.Stat. § 796.07(1)(a) excludes married couples from

---

another. The vast majority of Americans never purchase sex. The right asserted in this case is more analogous to the fundamental rights to marry and raise children; one could hardly imagine a penal law prohibiting the purchase of a spouse or child being declared unconstitutional. *See* Fla.Stat. § 63.212 (1995) (prohibiting sale of child).

11. Petitioner argues that there is no precedent for criminalizing a legal act merely because it is performed for consideration. Respondent, however, has pointed to two—the sale of children and the sale of organs. Respondent's Memorandum at 26, citing Fla.Stat. §§ 873.01 and 63.212.

Petitioner makes a feeble effort to distinguish the latter example, stating that "we are merely talking about assets of an estate, not fundamental constitutional rights or liberty interests." Petitioner's Reply at 54. Yet the Fourteenth Amendment to the Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law...." United States Const., 14th Amend, § 1 (emphasis added). Petitioner seems to believe that the framers of the Constitution somehow intended to provide less protection for property rights than they did for liberty interests. This may be Petitioner's personal preference, but it is not supported by the text of the Constitution.

its reach. Petitioner also seems to argue that the entire statutory scheme impermissibly discriminates against women. Having already determined that no fundamental right is denied by Chapter 796, the Court must determine whether Petitioner is a member of a suspect class, or otherwise entitled to a heightened degree of review under the equal protection clause. If she is not, the Court will evaluate both Petitioner's Due Process and Equal Protection claims under the rational basis test. *Bowers v. Hardwick,* 478 U.S. at 193, 106 S.Ct. at 2845; *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Tarter v. James,* 667 F.2d 964, 969 (11th Cir.1982); John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 14.3.

On its face, Chapter 796 applies equally to males and females, and is not facially discriminatory. Thus, in order to prevail on her claim, Petitioner must show that the statute is applied in a discriminatory manner. *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886). Additionally, Petitioner must prove that any disproportionate application of the law or impermissible classification was intentional. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

The intent requirement is not satisfied even if the legislature was aware that the enactment of the challenged statute would result in discrimination. Discriminatory intent requires more than a mere "awareness of consequences." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Instead, "'[d]iscriminatory purpose' implies that the decision-maker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Even if Petitioner shows that discriminatory intent was one of the State's motivating factors, the State may still "rebut the presumption of unconstitutional action" by showing that the discriminatory purpose did not cause the disparate impact, or by showing that the State would have reached the same result regardless of the discriminatory purpose. *Washington v. Davis,* at 239–

41, 96 S.Ct. at 2047–48; *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977).

Petitioner has provided no evidence, either in the form of statistics or otherwise, supporting the conclusion that discrimination was a motivating factor behind either the passage or application of Florida Statutes Chapter 796. She has provided voluminous exhibits in an effort to establish that prostitution statutes have a discriminatory impact on women, and are based on outmoded, patriarchal, and chauvinistic beliefs; but she has failed to prove the direct intent to discriminate against women. Because Petitioner has failed to show either the violation of a fundamental right, or the presence of intentional discrimination in this case, the Court must determine whether the challenged statute is rationally related to a legitimate state purpose. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

Of course, were Petitioner able to prove that Chapter 796 of the Florida Statutes was enacted merely to discriminate against women—to impose male domination, to demean or degrade women, or to discriminatorily "protect" women in a paternalistic manner, as Petitioner argues—she would be successful in her claim. *See Romer v. Evans,* ——— U.S. ———, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Petitioner, however, has utterly failed to establish that this is the case, and there are far too many logical explanations behind the passage of that statute to take her assertions seriously.

Petitioner claims that Chapter 769 violates the equal protection clause by treating married and unmarried couples unequally. The Florida Legislature, however, is free to treat dissimilarly situated people differently. As stated by the Supreme Court:

> Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. State of Texas,* 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Oregon State Board*

of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A.F. of L. v. American Sash & Door Co.,* 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. *Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. at 489, 75 S.Ct. at 465.

Under the rational basis test, the Court will only overturn a statute when "the varying treatment of different ... persons is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979), *quoted in Price v. Tanner,* 855 F.2d 820, 823 (11th Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989). Additionally, "the burden is not upon the state to establish the rationality of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary." *Karr v. Schmidt,* 460 F.2d 609, 617 (5th Cir.1972) (en banc), *cert. denied,* 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972), *quoted in, Kite v. Marshall,* 661 F.2d 1027, 1030 (5th Cir.1981), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982). Finally, "[a] classification having some reasonable basis does not offend [the Equal Protection Clause] merely because it is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). Instead, "if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." *Id.*

Applying this standard, the Court finds that the challenged statute is rationally related to a number of legitimate governmental interests. First, Respondent has a particularly strong interest in protecting the sanctity and strength of family and marital relationships. The Constitution "protects the sanctity of the family [and marriage] precisely because institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531

(1977), *quoted in Michael H. v. Gerald D.,* 491 U.S. at 124, 109 S.Ct. at 2342. This special constitutional protection provides a strong justification for the State's decision to exclude married couples from the effects of the challenged statute. *See Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Griswold v. Connecticut,* 381 U.S. at 485–86, 85 S.Ct. at 1682–83; *see also, Cherry,* 491 N.Y.S.2d at 945. It also justifies the criminal prohibition against prostitution, as most patrons of prostitutes are married men. J. James, J. Withers, M. Haft, S. Theiss & M. Owen, *The Politics of Prostitution* at 49 (2d ed.1977), *cited in* Perry, "Right of Privacy Challenges to Prostitution Statutes," at 469 n. 222. Petitioner herself has admitted that most of her customers were married. Petitioner's Affidavit (DE 10), ¶ 5. It is unquestionable that a spouse's relationship with a prostitute would have a disastrous effect on most marriages, and it is reasonable for the legislature to conclude that such an affair would lead to greater marital strife than mere adultery. Thus, the challenged provisions are reasonably related to the legitimate government purpose of protecting the institutions of marriage and the family.

The state also has a "substantial," if not compelling interest in protecting the morals of its citizens. *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 569, 111 S.Ct. 2456, 2462, 115 L.Ed.2d 504 (1991). Such a function lies at the very foundation of the "social contract" underlying all civilized democracies. The Supreme Court has recognized the States' legitimate interest in protecting the "social interest in order and morality," *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957), and has supported "the right of the Nation and of the States to maintain a decent society...." *Paris Adult Theatre I v. Slaton,* 413 U.S. at 59–60, 93 S.Ct. at 2635–37.

"This Nation's laws are constantly based on notions of morality," *Bowers v. Hardwick,* 478 U.S. at 196, 106 S.Ct. at 2846; such laws are crucial to a stable and conscientious society. Because every individual's concept of morality may differ, the only legitimate basis

for imposing a particular set of mores upon a population is democratic concensus; and the only limitation our Constitution places on this rule of the majority is to insure that such laws are applied to all with an even hand, and that certain fundamental rights are not infringed. Petitioner, however, would have this Court follow a different course by allowing her to impose her mores—which are shared by a diminutive minority—upon the majority. This the Court cannot do, for while our Constitutional system may be "counter-majoritarian" in certain instances, it is not "pro-minoritarian." As stated by Justice Scalia in his concurring opinion in *Barnes v. Glen Theatre, Inc.*:

> there is no basis for thinking that our society has ever shared that Thoreauvian "you-may-do-what-you-like-so-long-as-it-does-not-injure-someone-else" beau ideal—much less for thinking that it was written into the Constitution. Our society prohibits, and all human societies have prohibited, certain activities not because they harm others but because they are considered, in the traditional phrase, "contra bonos mores," i.e., immoral. In American society, such prohibitions have included, for example, sadomasochism, cockfighting, bestiality, suicide, drug use, prostitution, and sodomy. While there may be great diversity of view on whether various of these prohibitions should exist (though I have found few ready to abandon, in principle, all of them), there is no doubt that, absent specific constitutional protection for the conduct involved, the Constitution does not prohibit them simply because they regulate "morality." See *Bowers v. Hardwick*, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986) (upholding prohibition of private homosexual sodomy enacted solely on "the presumed belief of a

majority of the electorate in [the jurisdiction] that homosexual sodomy is immoral and unacceptable"). *See also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 68, n. 15, 93 S.Ct. 2628, 2641, n. 15, 37 L.Ed.2d 446 (1973); *Dronenburg v. Zech*, 239 U.S.App. D.C. 229, 238, and n. 6, 741 F.2d 1388, 1397, and n. 6 (1984) (opinion of Bork, J.).

501 U.S. at 574–75, 111 S.Ct. at 2465.

Similarly in this case, it is reasonable to believe that the majority of citizens of the State of Florida condemn the act of prostitution as "immoral and unacceptable," and it is not this Court's place to tell them that they are wrong. While this moral judgment obviously will offend and aggravate a few, including Petitioner, it does not implicate the Fourteenth Amendment. The dictate of the Constitution is clear: "[f]or protection against abuses by legislatures the people must resort to the polls, not to the courts." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. at 487, 75 S.Ct. at 464.

Numerous other legitimate interests support the legislation at issue in this case, including: crime prevention; [12] protection of public health and welfare; protection of juveniles; and protection of the character of the State's communities.[13]

Petitioner's arguments stridently attacking the prudence of Florida's prostitution statute simply are insufficient to overcome her burden in this case, and are more suitable for consideration by the Legislature. This Court will not engage in an extensive, probing, analysis into the logic underlying the Legislature's decision to enact the challenged prohibition. Instead,

> the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the

**12.** *See Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); *Paris Adult Theatre I*, at 58, 93 S.Ct. at 2635; *Barnes*, at 583–84, 111 S.Ct. at 2469–70 (Souter, J., concurring) (citing cases).

**13.** *See Paris Adult Theatre I*, at 58, 93 S.Ct. at 2635 (noting "the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself.").

Petitioner states that "strip clubs have been very successful and quietly zoned in mid-grade commercial zoning for years without any tarnish to the community." Petitioner's Brief, at 57. Petitioner's argument evokes the picture of Norman Rockwell's famous painting of Stockbridge Massachusetts, its quaint homes and shops covered in quiet drifts of snow, and standing in perpetual indignation next to the glitzy "XXX Pornacopia!" Can anyone doubt the "tarnishing" effect of such an addition?

United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain.

*Tyson & Brother United Theatre Ticket Offices v. Banton,* 273 U.S. 418, 446, 47 S.Ct. 426, 434, 71 L.Ed. 718 (1927) (Homes, J., joined by Brandeis, J., dissenting), *quoted in, Paris Adult Theatre I,* 413 U.S. at 68, 93 S.Ct. at 2641 (1973).

It has long been the position of the Supreme Court that so long as a legislative act does not run afoul of a specific constitutional prohibition, a court should not second guess the wisdom of the act. *See e.g., Paris Adult Theatre I,* at 57, 93 S.Ct. at 2635; *McLaughlin v. State of Florida,* 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964) (noting that while provisions banning pre-marital sexual relations and adultery may be legitimately applied to all citizens, particular racial groups may not be singled out for punishment). It is because "judges 'possess no special expertise' qualifying them 'to supervise the private morals of the Nation,'" that it is appropriate for the courts to leave such decisions to the legislatures. *Jacobellis v. State of Ohio,* 378 U.S. 184, 188 n. 3, 84 S.Ct. 1676, 1678 n.3, 12 L.Ed.2d 793 (1964), citing, Lockhart and McClure, "Censorship of Obscenity: The Developing Constitutional Standards," 45 Minn.L.Rev. 5, 116 (1960).

In an effort to inject some life into the merits of her argument, Petitioner attempts to metamorphosize the State into some evil spirited Orwellian behemoth bent on the destruction of women's rights. Yet her argument belies a basic misunderstanding of the social contract which forms the basis of our government. In our constitutional system, states do not exist as independent entities unaccountable to those whom they govern. Instead, they are communal bodies, through which their constituent members express their common will. It is the very essence of our democratic republic that citizens can influence and direct the political process by casting ballots. Thus, if any law is "a direct and arrogant slap in the face to all women and men in Florida," it is a slap inflicted by those men and women upon themselves. When citizens become unhappy with their government, it is incumbent upon them to make their will known to their representatives.

■ As noted by the Fourth Circuit Court of Appeals, "[t]he constitution delegates to the legislative and executive branches, not to the federal courts, the establishment of broad social agendas and the expression of ideals of public morality." *Doe v. Duling,* 782 F.2d at 1207, citing *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760; *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975). No fundamental right is at issue in this case, and Petitioner has failed to show that the challenged statute violates the Equal Protection Clause. Thus, if Chapter 796 is to change, it must be at the hands of the majority.

The Court has reviewed the motion and the record, and being otherwise duly advised, it is hereby:

**ORDERED** and **ADJUDGED** as follows:

1. Petitioner's Motion for Summary Judgment be and the same is hereby **DENIED;**

2. Respondent's Motion for Summary Judgment be and the same is hereby **GRANTED** in its entirety, and judgment is hereby entered on behalf of Respondent Robert Butterworth, Attorney General of the State of Florida, and against Petitioner, Jane Roe II.

3. This case is **CLOSED.**